**TROUTMAN PEPPER LOCKE LLP**
Chloe Ann Lee (Bar No. 351040)
chloeann.lee@troutman.com
100 Spectrum Center Drive, Suite 1500
Irvine, California 92618
Telephone: (949) 622.2700
Facsimile: (949) 622.2739

*Attorneys for Defendants,*
*The Nielsen Company (US), LLC and*
*Gracenote, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

AMANDA FRYSLIE, ARMANDO LLACUNA, and BADRUL ULA,

Plaintiffs,

vs.

THE NIELSEN COMPANY (US), LLC and GRACENOTE, INC.,

Defendants.

Case No.: 4:26-cv-8477

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332, 1441(a), 1453, AND 1446**

Filed Concurrently With:

- *Certification of Disclosure of Conflicts, Interested Entities and Parties, and Citizenship; and*
- *Declaration of Lauren Connell*

Complaint Filed: July 10, 2026
Removal Filed: August 14, 2026

**TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND TO PLAINTIFFS AND PLAINTIFFS' ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants The Nielsen Company (US), LLC ("Nielsen") and Gracenote, Inc. ("Gracenote," collectively with Nielsen, "Defendants"), by and through counsel, hereby remove the above-captioned action from the Superior Court of the State of California, in and for the County of Alameda, to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1332, 1441(a), 1453, and 1446. In support of this removal, Defendants state as follows:

## I. THE STATE COURT ACTION

1. On or about July 10, 2026, Plaintiffs Amanda Fryslie, Armando Llacuna, and Badrul Ula (collectively, "Plaintiffs") filed a civil complaint (the "Complaint") against Defendants in the Superior Court of the State of California, County of Alameda, Case No. 26CV198309 (the "Action").

2. On July 17, 2026, Plaintiffs caused Defendants to be served with the Complaint, together with the Summons, Civil Case Cover Sheet, and Civil Cover Sheet Addendum, and Notice of Case Management Conference. A true and correct copy of the Complaint that was served on Defendants is attached to this Notice as **Exhibit 1**. A true and correct copy of the notice of service on Nielsen is attached to this Notice as **Exhibit 2**. A true and correct copy of the notice of service on Gracenote is attached to this Notice as **Exhibit 3**. True and correct copies of the Summons, Civil Case Cover Sheet, and Civil Cover Sheet Addendum and Notice of Case Management Conference are attached to this Notice as **Exhibit 4**. Defendants have not received any other service of pleadings, orders, or filings in the Action, other than the documents attached to this Notice as Exhibits 1 and 4.

3. In the Complaint, Plaintiff Amanda Fryslie is alleged to be a resident of Bakersfield, California. Ex. 1, ¶ 10.

4. In the Complaint, Plaintiff Armando Llacuna is alleged to be a resident of Pleasant Hill, California. *Id.*, ¶ 11.

5. In the Complaint, Plaintiff Badrul Ula is alleged to be a resident of Riverside, California. *Id.*, ¶ 12.

6. Plaintiffs allege Defendant Nielsen is a single member "limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York." *Id.*, ¶ 13.

7. Defendant Nielsen's sole member is ACNielsen Corporation, which is a Delaware corporation with it principal place of business located in New York, New York. *See* Declaration of Lauren Connell ("Connell Decl.") ¶ 5(a).

8. Defendant Gracenote is a Delaware corporation with its principal place of business located in New York, New York. *See id.* ¶ 5(b).

9. Plaintiffs assert seven causes of action in the Complaint for (i) violation of Section 631 of the California Invasion of Privacy Act ("CIPA") (Cal. Penal Code § 631); (ii) violation of Section 638.51 of the CIPA (Cal. Penal Code § 638.51); (iii) violation of Section 632 of the CIPA (Cal. Penal Code § 632); (iv) violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") (Cal. Penal Code § 502); (v) invasion of privacy in violation of Article 1, Section 1 of the California Constitution; (vi) violation of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200); and (vii) common law invasion of privacy – intrusion upon seclusion. *See* Ex. 1, ¶¶ 89-142.

10. Plaintiffs also seek to represent a putative class and define this putative class as:

> All California residents who, during the Class Period: (a) visited a website or used an application on which Nielsen's Tracking Technologies were deployed, including but not limited to ESPN.com, the ESPN mobile application, FoxBusiness.com, FoxSports.com, the Fox Sports mobile application, and Tubi; or (b) viewed content on an internet-connected Smart TV as to which ACR-derived viewing data was collected by, transmitted to, licensed to, or otherwise obtained by Defendants; or (c) otherwise had their communications or personal information collected by Defendants through the tracking and content-recognition technologies described herein, during the applicable limitations period before and after the filing of this Complaint and through and including the date of resolution.

*Id.*, ¶ 82. Plaintiffs allege that "the exact number of Class Members is unknown to Plaintiffs at this time" but that the "Nielsen's Tracking Technologies are deployed across thousands of websites and

applications used by millions of Californians, and ACR-equipped Smart TVs sit in millions of California homes." *Id.*, ¶ 83.

11. Plaintiffs seek (1) declaratory relief; (2) injunctive relief; (3) damages, pursuant to Cal. Penal Code § 637.2, of at least five thousand dollars for each violation; (4) restitution and disgorgement; (5) reasonable attorneys' fees and other litigation costs pursuant to Cal. Penal Code § 502(e)(2) and Cal. Code Civ. Proc. § 1021.5; and (6) pre- and post-judgment interest. *Id.*, Prayer for Relief.

## II. <u>REMOVAL IS APPROPRIATE UNDER CAFA</u>

12. This Action is removable under the Class Action Fairness Act of 2005 ("CAFA"), which provides that "[a] class action may be removed to a district court of the United States in accordance with [28 U.S.C. § 1446] . . . without regard to whether any defendant is a citizen of the State in which the action is brought . . . ." 28 U.S.C. § 1453(b).

13. CAFA provides that federal district courts "shall have original jurisdiction of any civil action" (1) which is a "class action," (2) "in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant," and (3) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," provided that (4) the members of the putative class number at least 100. 28 U.S.C. § 1332(d)(2), (5). All four conditions are satisfied here.

### A. The Complaint Is a Class Action.

14. Plaintiffs seek to represent a putative class defined as:

> All California residents who, during the Class Period: (a) visited a website or used an application on which Nielsen's Tracking Technologies were deployed, including but not limited to ESPN.com, the ESPN mobile application, FoxBusiness.com, FoxSports.com, the Fox Sports mobile application, and Tubi; or (b) viewed content on an internet-connected Smart TV as to which ACR-derived viewing data was collected by, transmitted to, licensed to, or otherwise obtained by Defendants; or (c) otherwise had their communications or personal information collected by Defendants through the tracking and content-recognition technologies described herein, during the applicable limitations period before and after the filing of this Complaint and through and including the date of resolution.

Ex. 1, ¶ 82.

**B. Minimal Diversity Exists Under CAFA.**

15. For diversity purposes, an individual's citizenship is determined by the individual's domicile. *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986). An individual's domicile is "her permanent home, where she resides with the intention to remain or to which she intends to return." *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001). "It is a longstanding principle that 'the place where a person lives is taken to be his domicile until facts adduced establish the contrary.'" *NewGen, Ltd. Liab. Co. v. Safe Cig, Ltd. Liab. Co.*, 840 F.3d 606, 614 (9th Cir. 2016) (quoting *Anderson v. Watt*, 138 U.S. 694, 706 (1891)).

16. In the Complaint, each of the Plaintiffs alleges they are citizens of the State of California and that they reside in the State of California. Ex. 1, ¶¶ 10–12. Therefore, all Plaintiffs are citizens of the State of California.

17. For the purposes of establishing diversity jurisdiction under 28 U.S.C. § 1332, "a limited liability company 'is a citizen of every state of which its owners/members are citizens." *NewGen, Ltd. Liab. Co.*, 840 F.3d at 612 (quoting *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006)). When a limited liability company's owner or member is a corporation, the corporation is a citizen of the state in which it is incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c). A corporation's principal place of business "is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).

18. Defendant Nielsen is a single-member limited liability company formed under the laws of the State of Delaware. *See* Connell Decl. ¶ 5(a). The sole member of Nielsen is ACNielsen Corporation, a Delaware corporation with its principal place of business located at 675 Avenue of the Americas, 4th Floor, New York, New York 10010. *Id.*, ¶ 5(c). Defendant Nielsen is a citizen of Delaware and New York.

19. Defendant Gracenote is a Delaware corporation with its principal place of business located at 675 Avenue of the Americas, 4th Floor, New York, New York 10010. *Id.*, ¶5(b). Defendant Gracenote is a citizen of Delaware and New York.

20. Minimal diversity under CAFA "is satisfied if any class member has a citizenship different from any defendant." *Faulk v. Jeld-Wen, Inc.*, 159 F.4th 618, 622 (9th Cir. 2025). CAFA's diversity requirement is satisfied here as all of the Plaintiffs are citizens of California and the Defendants are citizens of Delaware and New York.

**C. The Amount in Controversy Is Satisfied Under CAFA.**

21. "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(6).

22. Plaintiffs seek class damages comprised of (1) declaratory relief; (2) injunctive relief; (3) damages, pursuant to Cal. Penal Code § 637.2, of at least five thousand dollars for each violation; (4) restitution and disgorgement; (5) reasonable attorneys' fees and other litigation costs pursuant to Cal. Penal Code § 502(e)(2) and Cal. Code Civ. Proc. § 1021.5; and (6) pre- and post-judgment interest. *Id.* at Prayer for Relief.

23. Without conceding that Plaintiffs or the putative class members are entitled to or could recover any damages, the Complaint demonstrates the amount in controversy in this action exceeds $5,000,000, under the "preponderance of the evidence" standard. *Rodriguez v. AT & T Mobility Servs*., 728 F.3d 975, 981 (9th Cir.2013) ("A defendant seeking removal of a putative class action [under CAFA] must demonstrate, by a preponderance of evidence, that the aggregate amount in controversy exceeds the jurisdictional minimum."); *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) ("[A] removing defendant's notice of removal 'need not contain evidentiary submissions' but only plausible allegations of the jurisdictional elements.") (quoting *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)); *Barrett v. Armadillo Holdings, LLC*, No. 1:22-CV-00882-DJC-DB, 2024 WL 1133419, at *2 (E.D. Cal. Mar. 15, 2024) ("A defendant removing a class action filed in state court pursuant to CAFA need only plausibly allege in the notice of removal that the CAFA prerequisites are satisfied.") (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014)).

24. Plaintiffs purport to bring this action on behalf of "all California residents" who "(a) visited a website or used an application on which Nielsen's Tracking Technologies were

deployed;" "(b) viewed content on an internet-connected Smart TV as to which ACR-derived viewing data was collected by, transmitted to, licensed to, or otherwise obtained by Defendants;" or "(c) had their communications or personal information collected by Defendants through the tracking and content-recognition technologies." Ex. 1, ¶ 82.

25. Plaintiffs allege that "Nielsen's Tracking Technologies are deployed across thousands of websites and applications ***used by millions of Californians,*** and ACR-equipped Smart TVs ***sits in millions of California homes.***" *Id.*, ¶ 83 (emphasis added).

26. Even assuming only 1,001 (less than .1%) of the alleged millions of Californians who had their website and Smart TV interactions tracked, CAFA's $5,000,000 amount in controversy threshold is easily satisfied ($5,000 x 1,001 = $5,005,000).

27. Considering the allegations in the Complaint, there can be no legitimate dispute that the amount in controversy requirement for original jurisdiction under 28 U.S.C. § 1332(d)(2) is satisfied.

**D. Removal Is Timely.**

28. Defendants were served on July 17, 2026. *See* Exs. 2–3. Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed with this Court within thirty (30) days of Defendants' receipt "through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based[.]"

**E. Compliance with Other Removal Requirements.**

29. Nielsen and Gracenote are the only named defendants in this action. Nielsen and Gracenote both consent to this removal. *See* Connell Decl., ¶ 6; *see also* 28 U.S.C. § 1446(b)(2)(A).

30. In accordance with 28 U.S.C. § 1446(a), this Notice of Removal is filed in the District in which the action is pending. The Superior Court of the State of California for the County of Alameda is located within the Northern District of California, and cases from the County of Alameda are assigned to the Oakland Division. Therefore, venue is proper in this Court because it is "the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

31. In accordance with 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendants are attached as Exhibits to this Notice.

32. In accordance with 28 U.S.C. § 1446(d), upon filing of this Notice of Removal, Defendants will give written notice of this Notice of Removal to Plaintiffs. Defendants will also file a true and correct copy of this Notice of Removal with the Clerk of the Superior Court of California for the County of Alameda.

WHEREFORE, Defendants Nielsen and Gracenote remove this action to the United States District Court for the Northern District of California.

DATED: August 14, 2026

**TROUTMAN PEPPER LOCKE LLP**

By: */s/ Chloe Ann Lee*
Chloe Ann Lee

*Attorneys for Defendants,*
*The Nielsen Company (US), LLC and*
*Gracenote, Inc.*

# EXHIBIT 1

Matthew W. Ruan (SBN 264409)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com

Counsel for Plaintiffs and the Proposed Class
[Additional counsel listed on signature page.]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| AMANDA FRYSLIE, ARMANDO LLACUNA, and BADRUL ULA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NIELSEN COMPANY (US), LLC, a Delaware limited liability company; and GRACENOTE, INC., a Delaware corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. Violation of Cal. Penal Code § 631<br>2. Violation of Cal. Penal Code § 638.51<br>3. Violation of Cal. Penal Code § 632<br>4. Violation of Cal. Penal Code § 502<br>5. Violation of the California Constitution, Article I, § 1<br>6. Violation of Cal. Bus. & Prof. Code § 17200, et seq.<br>7. Common Law Invasion of Privacy – Intrusion Upon Seclusion<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Amanda Fryslie, Armando Llacuna, and Badrul Ula (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint and Demand for Jury Trial against Defendants The Nielsen Company (US), LLC ("Nielsen") and Gracenote, Inc. ("Gracenote") (together, "Defendants") for surreptitiously intercepting, collecting, and monetizing consumers' communications and personal information across the internet, mobile applications, and home televisions. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief.

## NATURE OF THE ACTION

1. This lawsuit challenges Nielsen's vast data surveillance of California residents' internet, mobile application, and television viewing activities without their knowledge or consent.

2. Nielsen holds itself out as the "gold standard" of audience measurement, the company whose ratings decide what America watches. But behind that public-facing role, Nielsen operates a vast, hidden surveillance and identity-resolution apparatus. Nielsen embeds invisible tracking code, including cookies, pixels, tags, and software development kits ("SDKs") (collectively, the "Tracking Technologies"), on thousands of websites and mobile applications. And through its wholly owned subsidiary Gracenote, Nielsen embeds automatic content recognition ("ACR") software directly into millions of Smart TVs at the factory, before any consumer ever takes the television home.

3. Through the Tracking Technologies, Nielsen intercepts users' communications with the websites and apps they visit in real time, as those communications occur, including the pages they visit, the URLs they request, the search terms they enter, the articles they read, the videos they watch (second by second), their IP addresses, and their device information.

4. Through Gracenote's ACR technology, Defendants extend this surveillance into the living room. ACR software embedded in Smart TVs monitors, fingerprints, and reports back what is displayed on the television screen, regardless of source: cable and broadcast programming, streaming services, DVDs and Blu-ray discs, video games, and anything else displayed through the television's HDMI inputs, including content from laptops and personal media. Independent researchers have confirmed that this monitoring occurs as frequently as every fifteen seconds and continues even when the television is used merely as a "dumb" display for an external device.

5. Critically, Nielsen does not merely intercept these communications. It processes them and combines them with unique, persistent identifiers, including its own "IMRID" browser cookie, mobile advertising identifiers, hashed email addresses, IP addresses, and Smart TV device identifiers, to build a unique, persistent consumer profile, akin to a fingerprint, for each user. Nielsen's self-described "Identity System" contains more than two billion "de-duplicated" identifiers and uses machine-learning algorithms, offline data purchased from credit bureaus and data brokers such as Experian and TransUnion, and

Nielsen's recruited panels to cluster those identifiers into individual people and households. The result is a single unified dossier that links each consumer's browsing activity on every Nielsen-tagged website and app with everything that consumer watches, plays, and displays on the family television.

6. Nielsen then exploits these consumer profiles for its own commercial purposes. Nielsen packages and sells the intercepted data, calibrated, enriched, and organized into more than 20,000 ready-made audience segments, to advertisers and advertising platforms for audience targeting, campaign measurement, and attribution, generating billions of dollars in annual revenue. Consumers receive nothing in return and are never told that any of this is occurring.

7. Users never consented to any of this. Nielsen is a business-to-business company: consumers do not visit Nielsen's website, do not see its name, do not encounter its privacy policies, and have no relationship with it whatsoever. Consumers likewise are never told that Gracenote, a Nielsen company, receives what their televisions observe. Defendants' surveillance is designed to be invisible to the consumers it targets.

8. Defendants' conduct violates the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 638.51, and 632; the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; the constitutional right to privacy guaranteed by Article I, Section 1 of the California Constitution; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and the common law prohibition on intrusion upon seclusion.

9. Plaintiffs bring this action on behalf of themselves and the millions of California residents whose communications Defendants have intercepted and monetized. Plaintiffs seek statutory damages, compensatory and punitive damages, restitution, disgorgement, and injunctive relief to halt Defendants' unlawful surveillance.

**PARTIES**

10. Plaintiff Amanda Fryslie is an individual and citizen of the State of California, residing in Bakersfield, California.

11. Plaintiff Armando Llacuna is an individual and citizen of the State of California, residing in Pleasant Hill, California.

12. Plaintiff Badrul Ula is an individual and citizen of the State of California, residing in Riverside, California.

13. Defendant The Nielsen Company (US), LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Nielsen is the principal U.S. operating entity of the Nielsen group of companies, which has been privately held since 2022, when it was acquired by a consortium led by Evergreen Coast Capital Corp., an affiliate of Elliott Investment Management, and Brookfield Business Partners in an all-cash transaction valued at approximately $16 billion. Nielsen generates approximately $3.5 billion in annual revenue.

14. Defendant Gracenote, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business and worldwide headquarters at 2000 Powell Street, Emeryville, California 94608, in Alameda County. Gracenote was founded in Emeryville in 1998 and has been headquartered there ever since. Gracenote has been registered with the California Secretary of State to transact business in California since January 4, 2000 (entity no. 2207070). Nielsen acquired Gracenote in February 2017 for $560 million, specifically to integrate Gracenote's ACR and content-metadata capabilities into Nielsen's measurement and data businesses. Within months of the acquisition, Nielsen launched measurement and data products built on Gracenote's Smart TV ACR viewership data.

15. At all relevant times, Nielsen and Gracenote have operated as a single, integrated enterprise with respect to the conduct alleged herein. Nielsen's own product documentation and marketing materials describe Gracenote's ACR data as part of Nielsen's unified measurement offering. Gracenote's ACR-derived viewing data feeds Nielsen's identity-resolution and measurement products, and Nielsen directs, controls, ratifies, and profits from Gracenote's data-collection practices. Each Defendant acted as the agent, partner, joint venturer, and/or alter ego of the other with respect to the acts alleged herein, and each aided, agreed with, employed, and conspired with the other to commit the violations alleged herein.

**JURISDICTION AND VENUE**

16. This Court has subject-matter jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution and Cal. Code Civ. Proc. § 410.10. This action is brought as a class action on behalf of Plaintiffs and Class Members pursuant to Cal. Code Civ. Proc. § 382.

17. This Court has general personal jurisdiction over Gracenote because Gracenote's principal place of business and worldwide headquarters are, and at all relevant times have been, located in Emeryville, Alameda County, California. Gracenote is therefore at home in California for purposes of general jurisdiction.

18. This Court has personal jurisdiction over Nielsen because Nielsen has purposefully directed its activities at California and has systematically and continuously conducted business in California for decades. Among other things:

(a) Nielsen is a registered data broker in California. Nielsen registered with the California Attorney General as a data broker (under the name "Nielsen Marketing Cloud") pursuant to Cal. Civ. Code § 1798.99.82, with registrations approved in 2020 and 2022, and remains registered today: the California Privacy Protection Agency's 2026 California Data Broker Registry includes registrations of both The Nielsen Company, LLC and eXelate, Inc., each doing business as "Nielsen Marketing Cloud." That registration constitutes an express acknowledgment that Nielsen knowingly collects and sells the personal information of California consumers with whom it has no direct relationship, and a deliberate decision to avail itself of the privilege of conducting data-brokerage activities directed at California residents;

(b) Nielsen maintains offices and operations in California, including its longstanding Los Angeles office at 6255 W. Sunset Boulevard, and has held an active City of Los Angeles business tax registration certificate continuously since 1998. Nielsen has been registered with the California Secretary of State to transact business in California since October 6, 2008 (entity no. 200828110266), and maintains a registered agent for service of process in Sacramento. Nielsen employs field representatives throughout California who recruit and service the California households participating in Nielsen's measurement panels;

(c) California is indispensable to Nielsen's measurement business. Nielsen designates and measures eleven "designated market areas" ("DMAs") in California, including Los Angeles, the nation's second-largest television market (approximately 5.8 million TV households), and San Francisco-Oakland-San Jose (approximately 2.5 million TV households), together comprising roughly 12.7 million California TV households, more than one-tenth of all U.S. television homes. Nielsen recruits, meters, and continuously collects viewing data from panel households across California;

(d) Nielsen knowingly collects Californians' communications and geolocation. Nielsen's tracking infrastructure derives and records users' geographic locations from their IP addresses and device signals: Nielsen's own SDK documentation makes the DMA and country-code fields mandatory configuration parameters, and Nielsen's Marketing Cloud privacy statement admits that Nielsen collects "the approximate geographic area (i.e. country, city, town, district) derived from your IP address."[1] Nielsen accordingly knows when it is tracking California residents, either before or immediately after its software begins intercepting their communications, and continues anyway. Nielsen's contacts with California residents are deliberate, not incidental: they are the product of software deployed to identify, profile, and monetize Californians;

(e) Nielsen's commercial relationships are concentrated in California. Nielsen's measurement, identity, and data products serve and depend upon California-headquartered media and technology companies, including, among others: Netflix (Los Gatos); Roku (San Jose), with which Nielsen announced a long-term "strategic alliance" in 2021; the Walt Disney Company and Hulu (Burbank/Santa Monica); Amazon Studios (Culver City); YouTube (San Bruno); Vizio and its Inscape ACR

[1] Nielsen, Nielsen Marketing Cloud Services Privacy Statement (updated Dec. 2025), https://www.nielsen.com/legal/privacy-principles/nielsen-marketing-cloud-services-privacy-statement/.

subsidiary (Irvine), whose Smart TV viewing data Nielsen has licensed since 2021; and LG Ad Solutions (Mountain View), which began providing Nielsen with Smart TV ACR data in 2023; and

(f) Nielsen has itself invoked the courts of California, including this Court. Nielsen entities have filed and prosecuted actions in the Superior Court for the County of Alameda, and Gracenote has filed and prosecuted actions in California's federal courts, availing themselves of the benefits and protections of California law.

19. Venue is proper in this Court pursuant to Cal. Code Civ. Proc. §§ 395 and 395.5 because Defendant Gracenote resides and maintains its principal place of business in Alameda County; because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims, including the development and operation of the ACR technology at issue, occurred in and emanated from Alameda County; and because Defendants' liability to Class Members residing in Alameda County arose, in part, in Alameda County.

## COMMON FACTUAL ALLEGATIONS

### A. Nielsen's Surveillance-Based Business Model

20. Nielsen is a measurement, data, and analytics company. For nearly a century, Nielsen's panel-based television ratings have served as the "currency" by which advertising time is bought and sold. Today, however, Nielsen's business extends far beyond its recruited, consenting panels: Nielsen now collects behavioral, device, and content-interaction data from hundreds of millions of ordinary consumers who never signed up for anything, have no dealings with Nielsen, and do not know that Nielsen exists.

21. Nielsen operates across multiple layers of the digital advertising ecosystem. Digital advertising connects advertisers (the "buy side") with publishers, i.e., websites, apps, and streaming services with advertising space to sell (the "sell side"). Between them sits an automated machinery of ad servers, exchanges, supply-side platforms, and demand-side platforms ("DSPs") that buys and sells ad impressions in milliseconds, frequently through automated auctions known as real-time bidding. The entire apparatus runs on data about individual users: who they are, where they are, what they read, watch, and buy, and which advertisements they have already seen.

22. Nielsen functions as a critical data supplier and measurement layer within this ecosystem. Nielsen supplies audience segments, demographic data, and cross-device identity resolution to advertising platforms; verifies for advertisers which people saw which advertisements, on which devices, and for how long; and attributes consumers' subsequent behavior, such as visits and purchases, to particular ad exposures. Each of these services requires Nielsen to do the same underlying thing: surveil ordinary consumers at scale, link their activity across devices and contexts, and package the results for sale.

23. Lawmakers and regulators have sounded the alarm about precisely this ecosystem. A bipartisan group of United States Senators warned that advertising-auction participants receive "sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information," and that "[f]ew Americans realize that some auction participants are siphoning off and storing 'bidstream' data to compile exhaustive dossiers about them," dossiers "openly sold to anyone with a credit card, including to hedge funds, political campaigns, and even to governments."[2] In 2024, the Chair of the Federal Trade Commission warned, in an enforcement action against a data broker, that "the ease with which real-time bidding technology can be exploited to surveil Americans should raise serious alarm," because "no real safeguards limit who can access, harness, or retain this data," leaving "Americans' sensitive data extraordinarily exposed."[3] Nielsen, a registered data broker that supplies audience data and identity resolution to the same ecosystem, is among the companies those warnings describe.

24. To carry out this business, Nielsen has developed an integrated surveillance infrastructure comprising: (a) web and mobile Tracking Technologies embedded on thousands of websites and mobile applications; (b) Gracenote ACR software embedded in Smart TVs, plus ACR data licensed from Smart TV manufacturers and platforms; (c) an "Identity System" that combines the intercepted data with unique identifiers and third-party data to build a persistent profile of each consumer; and (d) commercial products,

[2] Letter from Sen. Ron Wyden et al. to John Stankey, Chief Executive Officer, AT&T Inc. (Apr. 1, 2021), https://www.cassidy.senate.gov/wp-content/uploads/media/doc/040121%20Bidstream%20Letter%20to%20ATT.pdf.

[3] Statement of Chair Lina M. Khan Joined by Comm'r Alvaro M. Bedoya & Comm'r Rebecca Kelly Slaughter, In re Mobilewalla, Inc., FTC File No. 2023196 (Dec. 3, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/statement-khan-bedoya-slaughter-mobilewalla.pdf.

including Digital Ad Ratings, Nielsen ONE, and Nielsen Audience Segments, through which Nielsen monetizes those profiles. Each component is described below.

**B. Nielsen's Interception of Users' Web and Mobile App Communications**

25. Nielsen provides publishers, advertisers, and app developers with measurement software, consisting of JavaScript "tags," tracking pixels, and SDKs, that they embed in their websites, advertisements, and mobile applications. Despite the benign-sounding label of "measurement," these Tracking Technologies operate as classic interception devices: when a user visits a webpage or uses an app in which they are embedded, they cause the user's own browser or device to transmit the user's communications and identifying information, in real time, to servers controlled by Nielsen.

26. A tracking pixel or tag is a small piece of invisible code that a website operator embeds in its webpages or advertisements. When a user's browser loads a page containing a Nielsen tag, the tag executes automatically (without any action by, or visibility to, the user) and forces the browser to open a separate, simultaneous connection to Nielsen's servers. Nielsen's collection endpoints operate on the "imrworldwide.com" domain, including, among others: secure-gl.imrworldwide.com, which collects measurement data; cdn-gl.imrworldwide.com, which hosts Nielsen's JavaScript SDK; events.imrworldwide.com, which receives measurement, viewability, and event pings; and dar.imrworldwide.com, which serves Digital Ad Ratings ("DAR") tags.

27. Through these forced, hidden connections, Nielsen's Tracking Technologies collect and transmit to Nielsen extensive information about the user and the user's communications with the website or app, including: the full URL of the page being viewed; the referring page; the content being viewed, such as the article, program, or video; search terms; timestamps; clicks and other interaction events; browser and device characteristics, including operating system, device type and model, browser type and version, and screen size; and the user's IP address. Nielsen's own Digital Measurement Privacy Statement admits that its software collects, depending on the platform, the user's "IP address, cookie ID, hashed email address, browser type, language, and referring website addresses" (desktop and connected TV) and "IP address, Cookie ID, hashed email address, device type and model, mobile Advertising identifiers, operating system" (mobile), together with "information about the content that was viewed – such as the

ad campaign, program or episode as well as information about where the content was viewed – such as the website or the app."[4]

28. These transmissions occur in real time, contemporaneously with the user's communications with the website or app; i.e., as pages load and as the user browses, searches, clicks, and watches, not after the fact. Nielsen's Tracking Technologies cause the contents of the user's communications to be duplicated and sent to Nielsen while those communications are in transit between the user and the website or app the user actually chose to visit.

29. To recognize the same user across different websites, sessions, and days, Nielsen assigns each browser a unique, persistent identifier. Nielsen's flagship identifier cookie, set from the imrworldwide.com domain, is called "IMRID." Industry cookie databases describe IMRID as a Nielsen cookie that "[r]egisters anonymised user data, such as IP address, geographical location, visited websites, and what ads the user has clicked," whose "main purpose ... is: Targeting/Advertising," and which persists on users' devices for extended periods.[5] The IMRID cookie functions as a permanent name tag: each time the user's browser encounters any website running Nielsen's code, the cookie is read and transmitted to Nielsen together with the user's current activity, allowing Nielsen to stitch together the user's browsing across every Nielsen-tagged property.

30. Nielsen also deploys its identifiers in "first-party" configurations on publishers' own domains, a deployment model that evades the third-party-cookie restrictions built into privacy-protective browsers. As a result, Nielsen's tracking is less visible to users and more difficult to detect or block, even for privacy-conscious consumers.

31. In mobile applications and connected-TV apps, Nielsen's SDKs perform the same function as its web tags, with even deeper access to the device. Nielsen's own engineering documentation discloses that its SDKs collect, among other things: the device's mobile advertising identifier (Apple IDFA or Google Advertising ID); the user's IP address; the device model and operating system; the DMA and

---

[4] Nielsen, Digital Measurement Privacy Statement (effective May 2025), https://www.nielsen.com/legal/privacy-principles/digital-measurement-privacy-statement/.

[5] Cookiepedia, IMRID, https://cookiepedia.co.uk/cookies/IMRID.

country code (both mandatory configuration fields); content metadata including the complete program or movie title, episode title, genre, length, and airdate; and the precise position of the user within video content, reported continuously. Nielsen's documentation instructs developers that the SDK's "setPlayheadPosition" function has to be called every second so that Nielsen receives a second-by-second record of exactly what the user watched and for how long.

32. Nielsen's SDK documentation further discloses parameters for the collection of hashed email addresses in SHA-256, MD5, and SHA-1 formats, the Unified ID 2.0 ("UID2") identifier, an advertising identifier "based on a user's verifiable PII (e.g. hashed email)," and a "luid" parameter defined as the "Living Unit ID - Experian Household ID," an identifier keyed to the credit bureau Experian's file on the user's household.[6] A hashed email address is not anonymous: it is a stable, unique identifier that is the same for a given email address everywhere it appears, and it is routinely used throughout the advertising industry, including by Nielsen, to match the same person across devices, websites, apps, and offline databases.

33. Nielsen's DAR tags, embedded in advertisements served across the web, fire measurement "beacons" at precise, documented intervals. Nielsen's own DAR implementation guide specifies the session's ping sequence: a main measurement ping when the ad is delivered; "Nielsen Measure" and "Primary Standard" pings to Nielsen's events.imrworldwide.com endpoint; timed pings after one, five, fifteen, and 120 seconds of continued exposure; quarterly milestone pings for video; and a final ping when the session ends. Each ping delivers to Nielsen the user's identifiers and exposure data, which Nielsen then matches against its identity graph to attach a name-equivalent profile, including age, gender, and other demographics, to the exposure.

34. Along with the contents of users' communications, Nielsen's Tracking Technologies systematically capture users' IP addresses. An IP address is a unique numerical identifier assigned to a device or household router that routes communications across the internet. Like a telephone number, an

[6] Nielsen Engineering Client Portal, Digital Measurement Persistent Identifiers, https://engineeringportal.nielsen.com/wiki/Digital_Measurement_Persistent_Identifiers; Nielsen Engineering Client Portal, AppSDK(), https://engineeringportal.nielsen.com/wiki/AppSDK().

IP address is unique "routing, addressing, or signaling information": it directs the user's communications from the user's home or workplace to the websites with which the user communicates, and it reveals the user's general geographic location, often to the city or ZIP-code level. IP addresses are extraordinarily valuable to the advertising industry precisely because they permit geographic targeting and household-level identification.

35. When combined with persistent cookies and device identifiers, IP addresses become powerful tools for identifying specific individuals. A cookie assigns a stable identifier to a browser; an IP address identifies the network connection in use at each moment. When the same IMRID cookie appears from a residential IP address in the mornings and evenings and an office IP address during working hours, Nielsen can associate those networks, and the home and workplace locations they imply, with the same person. Over time, this pattern uniquely distinguishes that person and maps their routine usage.

36. Nielsen also receives users' personal information through server-to-server integrations with publishers, platforms, and partners: direct data feeds that never pass through the user's device at all and are therefore undetectable by even the most sophisticated consumer. Nielsen's Digital Measurement Privacy Statement acknowledges that participating companies may provide data to Nielsen directly through connections to their servers, including persistent identifiers and hashed email addresses supplied by partners that "recognize their own users."

**C. Defendants' Collection of In-Home Television Viewing Data Through Gracenote ACR**

37. Defendants' surveillance does not stop at the browser. Through Gracenote, Defendants extend their interception into the home itself: the television screen.

38. Automatic content recognition, or ACR, is software embedded in Smart TVs, typically at the chipset or operating-system level and installed at the factory, that periodically captures what is displayed on the television screen, generates a digital "fingerprint" of it, and transmits that fingerprint, together with device identifiers, over the internet for matching against a reference database. ACR thereby identifies, in real time, exactly what is shown on the screen, regardless of its source.

39. Gracenote is one of the world's principal ACR providers. Gracenote's video ACR technology has been embedded in televisions from major consumer-electronics brands, including, among

others, Sony, Philips, LG, Vestel, and Loewe. Gracenote also partnered with MediaTek, the semiconductor company whose chips power more than half of the world's Smart TVs, to integrate Gracenote ACR at the chip level. Nielsen reported in 2017 that Gracenote ACR was implemented in more than 27 million Smart TVs across eight global consumer electronics brands. By 2018, deployment was reported at approximately 40 million connected televisions, and by 2019, the advertising trade press, reporting statistics Nielsen shared, placed Gracenote ACR in 18.9 million U.S. devices, working with twelve TV manufacturers, embedded in televisions since 2013.

40. Gracenote's ACR employs multiple recognition methods operating in concert. Video fingerprinting captures the actual visual content of the screen, i.e., the arrangement of pixels in the displayed frames, at sub-second intervals and matches it against a reference database of films, television programs, advertisements, and games. Audio fingerprinting captures samples of the audio stream for the same purpose. Nielsen's proprietary audio watermarking technologies, including the Nielsen Audio Encoder System II ("NAES II"), Nielsen Watermarks ("NW"), and Critical Band Encoding Technology ("CBET"), embed inaudible codes into broadcast audio that Nielsen-enabled devices detect and report, identifying the source and time of whatever is playing.

41. Gracenote's own executives have described the cadence of this surveillance. In a 2018 industry interview given by Gracenote's General Manager for Video and Sports, the operation of televisions then running Gracenote ACR (including televisions from LG, Roku, and Samsung) was described as follows: "[e]very 0.5 seconds the technology takes a screen fingerprint, sends it into the cloud, and matches it [to] a show or ad to understand what the viewer is watching," providing "information like when a person tunes out of a show, how long they watch for, and which ads they see," with the system generating, as of 2018, "6 trillion pieces of data monthly."[7]

42. Because ACR fingerprints whatever appears on the screen, it captures everything the television displays, from every source: cable, satellite, and over-the-air broadcasts; streaming apps; DVDs

---

[7] nScreenMedia, nScreenNoise – Next-Gen TV Powered by AI, ACR, Big Data (May 2018) (interview of Simon Adams, Gracenote General Manager, Video and Sports, TV Connect London), https://web.archive.org/web/20190915101324/https://nscreenmedia.com/nscreennoise-next-gen-tv-ai-acr-big-data/.

and Blu-ray discs; video-game consoles; and any device connected through the television's HDMI inputs, including laptops and personal media libraries. Nielsen's own announcements boast that Gracenote ACR "identifies TV programs, movies, advertisements and video games being viewed in real-time" and measures "how long consumers engage with content and what they tune in and out of."[8] Nielsen has likewise shared identification statistics with the advertising trade press: its ACR technology "identifies 70% of content, video games and ads a viewer watches," with the remaining 30% attributable chiefly to sources its technology "isn't allowed to see," and Nielsen "claims a 98% accuracy on its identification."[9]

43. Independent researchers have confirmed the intrusiveness of Smart TV ACR. In a 2024 peer-reviewed study presented at the ACM Internet Measurement Conference, researchers at University College London, UC Davis, and other institutions instrumented Samsung and LG Smart TVs and observed their network traffic. The researchers found that LG televisions, whose own documentation describes frame captures every ten milliseconds, batch those frames, "send[ing] the resultant content fingerprint every 15 seconds"; that Samsung televisions, whose own documentation describes frame captures every 500 milliseconds, transmit fingerprints approximately once per minute; and, critically, that "ACR operates even when [the television] is used as a 'dumb' display via HDMI," i.e., the television continues to fingerprint and report what is displayed even when it is merely serving as a monitor for an external device such as a laptop, game console, or DVD player.[10]

44. Each ACR query is generated by a specific, identified television. The fingerprints are transmitted together with device-level metadata, including device identifiers, IP address, model information, and timestamps, so that the matched content is logged and associated with that particular household's television. The result is a second-by-second record of everything displayed on the

---

[8] Nielsen/Gracenote, Nielsen Launches First Person-Level TV DMP Powered by Gracenote Smart TV Viewership Data (Oct. 31, 2017), https://gracenote.com/newsroom/nielsen-launches-first-person-level-tv-dmp-powered-by-gracenote-smart-tv-viewership-data/.

[9] Sarah Sluis, The Marketer's Guide to ACR Tech in Smart TVs, AdExchanger (June 26, 2019), https://www.adexchanger.com/ad-exchange-news/the-marketers-guide-to-acr-tech-in-smart-tvs/.

[10] Gianluca Anselmi, Yash Vekaria, Alexander D'Souza, Patricia Callejo, Anna Maria Mandalari & Zubair Shafiq, Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs, Proceedings of the 24th ACM Internet Measurement Conference (2024), https://arxiv.org/abs/2409.06203.

household's television: every program, movie, advertisement, video game, and DVD, and everything displayed from every connected device.

45. Defendants obtain this television-viewing data through complementary channels. First, ACR technology that Gracenote developed and embedded in Smart TVs beginning in 2013 generates fingerprint-derived viewing data from televisions in consumers' homes; upon information and belief, Gracenote-developed ACR remains active on millions of deployed televisions, and Defendants continue to receive viewing data derived from it. Second, Nielsen licenses ACR viewing data at scale from the platforms that operate ACR systems: from Roku, with which Nielsen entered a long-term "strategic alliance" in 2021 integrating Nielsen measurement into the Roku platform; from Inscape, the ACR subsidiary of California-based TV maker Vizio, since 2021, in a relationship expanded in 2022 and extended in 2025 and encompassing data from more than 20 million televisions; and, since October 2023, from LG Ad Solutions, under a deal providing Nielsen with ACR data from LG Smart TVs at the household level, a deal Nielsen touted as creating the largest ACR data footprint for TV measurement in the United States.

46. Consumers are never meaningfully informed of any of this. ACR functions are buried in television settings menus under deliberately opaque, generic labels that disclose nothing about pixel-level screen capture, second-by-second monitoring, or the transmission of viewing data to third parties: Samsung calls its ACR program "Viewing Information Services," and LG ties its ACR to a feature called "Live Plus," controlled by a settings toggle labeled simply "Viewing Information." Nowhere in the setup flow of these televisions is the consumer told that Nielsen or Gracenote, companies with which the consumer has no relationship whatsoever, will receive a fingerprinted record of everything displayed on the family television.

47. Regulators have repeatedly condemned precisely this conduct. In 2017, the Federal Trade Commission charged Vizio with capturing second-by-second information about video displayed on the smart TV, including video from consumer cable, broadband, set-top box, DVD, over-the-air broadcasts, and streaming devices, as many as 100 billion data points each day, and selling that data, paired with IP addresses and appended demographics, including sex, age, income, marital status, household size,

education level, home ownership, and home value, to third parties without consumers' knowledge or consent; Vizio paid $2.2 million to settle and later paid $17 million to settle a consumer class action over the same practices.

48. In December 2025, the Texas Attorney General sued Samsung, Sony, LG, TCL, and Hisense, alleging that their ACR technology "can capture screenshots of a user's television display every 500 milliseconds, monitor viewing activity in real time, and transmit that information back to the company without the user's knowledge or consent."[11] The State's petition against Samsung alleges that Samsung's ACR monitors consumers by capturing audio and video from the more than 73 million Samsung Smart TVs in the U.S. every 500 milliseconds. In February 2026, Samsung resolved the Texas action by agreeing to halt all collection and processing of ACR viewing data from Texas consumers unless it first obtains express, informed consent. Defendants sit at the center of, and profit from, the same ACR-based surveillance economy those enforcement actions target: Defendants embed the ACR software, license the ACR data streams, and convert them into commercial products.

49. Television viewing data is among the most intimate information about a person. What a family watches, plays, and displays on its living-room screen reveals political and religious orientation, health concerns, sexuality, finances, parenting, and tastes. Congress recognized as much when it enacted the Video Privacy Protection Act: video-viewing choices "reveal our likes and dislikes, our interests and our whims," and "say a great deal about our dreams and ambitions, our fears and our hopes."[12] Defendants' second-by-second capture of everything displayed on the home screen, including content from DVDs, video games, and personal devices that the consumer never transmitted to any online service, is a categorically more invasive intrusion than the single-website tracking at issue in prior internet-privacy cases. This surveillance is installed in the television before purchase, operates inside the home, and cannot practically be detected or avoided by the consumer.

---

[11] Tex. Att'y Gen., Attorney General Paxton Sues Five Major TV Companies, Including Some with Ties to the CCP, for Spying on Texans (Dec. 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-sues-five-major-tv-companies-including-some-ties-ccp-spying-texans

[12] 134 Cong. Rec. S5399 (daily ed. May 10, 1988) (statement of Sen. Leahy); *see* S. Rep. No. 100-599, at 7–8 (1988).

**D. Nielsen Combines the Intercepted Communications with Unique Identifiers to Build a Consumer Profile of Each User**

50. Nielsen does not merely intercept users' communications; interception is only the first step. Nielsen's business model depends on processing the intercepted communications and combining them with unique, persistent identifiers to construct a single, unified profile of each consumer: a digital fingerprint that uniquely identifies that consumer and accumulates that consumer's activity across every website, app, device, and television from which Nielsen collects data.

51. The instrument of this combination is the Nielsen Identity System. Nielsen has stated publicly that it has loaded "more than 2 billion de-duplicated identifiers across markets into the Identity System, growing every day."[13] The Identity System ingests the identifiers Nielsen's Tracking Technologies harvest, including IMRID cookies, mobile advertising IDs, hashed email addresses, UID2 tokens, IP addresses, and Smart TV device identifiers, and clusters them, using what Nielsen describes as "sophisticated machine learning algorithms," into individual people and households.

52. Nielsen's "Identity Sync" technology makes this collection continuous. In Nielsen's own words, Identity Sync enables "always-on, real-time collection of advertiser data associated with individuals, the devices they use over time and the online actions they take," and allows Nielsen to build "deterministic matches between consumers and their ad exposures using persistent identifiers as the connector."[14]

53. Nielsen's identity resolution combines deterministic matching, which links records that share a hard identifier, such as a hashed email address or login, with probabilistic matching, which infers from IP addresses, device characteristics, and behavioral patterns that different devices belong to the same person, and calibrates the results against Nielsen's recruited measurement panels, which Nielsen treats as a demographic "truth set." Nielsen has stated that its "Nielsen ID utilizes persistent, device-agnostic

---

[13] Nielsen, Nielsen Enhances Identity System for Digital Ad Measurement in Preparation for a Cookieless Future (Dec. 2021), https://www.nielsen.com/news-center/2021/nielsen-enhances-identity-system-for-digital-ad-measurement-in-preparation-for-a-cookieless-future/.

[14] Nielsen, Nielsen Rolls Out ID Resolution System for Global Attribution Measurement (Feb. 18, 2021), https://www.nielsen.com/news-center/2021/nielsen-rolls-out-id-resolution-system-for-global-attribution-measurement/.

identifiers that have been validated against its high-quality panel truth sets, enabling Nielsen to verify demographic characteristics and viewership over time across all media."[15]

54. Nielsen then enriches these profiles with sensitive offline data purchased from credit bureaus and data brokers:

(a) Experian. In 2022, Nielsen announced an expanded agreement under which "Experian marketing data assets will enhance the Nielsen Identity System by providing persistent IDs for open web measurement," with Nielsen's ID graph "link[ing] billions of first and third party signals." Nielsen's SDK documentation likewise provides for collection of the "Living Unit ID - Experian Household ID," keying Nielsen's surveillance records directly to Experian's household file;[16]

(b) LiveRamp. In 2024, Nielsen announced a partnership incorporating LiveRamp's "RampID" identity graph (a persistent, authenticated, person-level identifier) into Nielsen's measurement ecosystem; and

(c) TransUnion. Nielsen partners with the credit bureau TransUnion to enrich its data with aggregated consumer credit information built from TransUnion's consumer database consisting of more than 230 million U.S. records, providing credit-profile attributes at the ZIP+4 level, that is, to within a few households.

55. The profile that results is cross-device and cross-context by design. Nielsen's "Big Data + Panel" measurement combines its panels (individual-level data, reportedly obtained from as many as 1.2 million individuals) with what Nielsen describes as approximately 45 million "big data" households and 75 million devices drawn from cable and satellite set-top boxes (Comcast, Dish, DIRECTV) and Smart TV ACR (including Roku and Vizio). The same Identity System links a consumer's IMRID browser cookie to her phone's advertising ID, her hashed email address, her household's IP address, and her living-

---

[15] Nielsen, Nielsen Advances the Next Frontier of Measurement and Technology (Nov. 19, 2020), https://www.nielsen.com/news-center/2020/nielsen-advances-the-next-frontier-of-measurement-and-technology/.

[16] Nielsen, Nielsen and Experian Expand Agreement to Enhance Identity Demographics (Feb. 28, 2022), https://www.nielsen.com/news-center/2022/nielsen-and-experian-expand-agreement-to-enhance-identity-demographics/.

room television. The browsing she does at her desk, the articles she reads on her phone, and the programs, films, and games displayed on her family's TV are all fused into one dossier.

56. This cross-device profile defeats every privacy-protective measure a consumer might take. For example, a consumer who deletes cookies is re-identified by her hashed email or IP address; a consumer who compartmentalizes sensitive research onto a separate device is reunited with it by probabilistic matching; a consumer who never uses a website at all is profiled through the television. The profile persists, grows, and follows the consumer indefinitely. The profile functions as a fingerprint: it is unique to each consumer and is used to recognize her everywhere Nielsen's infrastructure reaches.

**E. Nielsen Uses the Consumer Profiles for Its Own Commercial Purposes**

57. Nielsen exploits these consumer profiles for its own account and profit. Nielsen is not a vendor passively processing data on behalf of the websites users chose to visit; it is an independent enterprise that takes the intercepted communications, aggregates them across thousands of unrelated sources, and sells the resulting intelligence as its own product.

58. Nielsen's DAR product sells advertisers demographic verification of their digital campaigns, reporting which people, by age and gender, saw their advertisements across web, mobile, and connected TV. That reporting is possible only because Nielsen matches each intercepted ad exposure to the consumer profile its Identity System maintains on the exposed person.

59. Nielsen ONE, Nielsen's flagship cross-media measurement platform, sells advertisers and publishers deduplicated, person-level audience measurement across linear television, streaming, and digital, a product that, by Nielsen's own description, requires linking the same individuals across every screen they use. The viewing data captured by ACR from a consumer's Smart TV and the browsing data captured by Nielsen's web and app Tracking Technologies become the "big data" that Nielsen sells access to through Nielsen ONE.

60. Nielsen Audience Segments packages the profiles directly for ad targeting. Nielsen markets "more than 20,000" custom and syndicated audience segments that categorize consumers by demographics, behaviors, interests, and purchases, available for activation in advertising platforms, including through a December 2025 integration making Nielsen segments available in Amazon's

advertising systems. Nielsen's data marketing claims behavioral data covering approximately 90% of the U.S. population, transactional data from more than 100 million individuals, psychographic data from more than 40 million directly measured profiles, and, through its Buyer Insights product, access to approximately 80% of all U.S. credit-card transactions.

61. None of the revenue from any of this flows to the consumers whose communications make it possible. Nielsen monetizes the personal information it intercepts for its own gain (approximately $3.5 billion in annual revenue) while the consumers it surveils remain unaware that Nielsen exists.

**F. Examples of Defendants' Surveillance in Practice**

62. Nielsen's Tracking Technologies operate continuously across thousands of websites and mobile applications, and its ACR surveillance operates across tens of millions of televisions. The examples below, drawn from network traffic analysis of widely used news, sports, and entertainment services, illustrate how Defendants' tracking functions in practice. They are illustrative only; Defendants' surveillance extends to every property and device on which their measurement infrastructure is deployed.

63. **ESPN (website and mobile app).** ESPN.com is among the most-visited sports websites in the United States, and the ESPN app is among the most popular sports apps. When users visit ESPN.com or use the ESPN app, Nielsen's embedded Tracking Technologies cause users' devices to transmit their private communications, including the full page title and URL of every page and article viewed, the titles of videos viewed, content identifiers, and interaction data, to Nielsen's imrworldwide.com servers in real time, together with users' IP addresses, persistent Nielsen identifiers, including those assigned by the IMRID cookie, and device identifiers.

64. **Fox Business (website).** FoxBusiness.com is a financial news website providing coverage of markets, the economy, and personal finance. When users visit any page on FoxBusiness.com, including pages reflecting sensitive financial interests, such as pages concerning cryptocurrency or particular stocks, Nielsen's Tracking Technologies intercept and transmit those communications, including the full page title and URL, to Nielsen's servers in real time, together with users' IP addresses, persistent Nielsen identifiers, including those assigned by the IMRID cookie, and device identifiers.

65. **Fox Sports (website and mobile app).** FoxSports.com and the Fox Sports app deliver live sports coverage, scores, and video to millions of users. When users browse Fox Sports properties, Nielsen's embedded code intercepts their private communications, including, for all such content viewed, the full page URL, video content watched, with playhead position reported every second, and interaction events, and transmits them to Nielsen, keyed to users' persistent identifiers. Nielsen's Tracking Technologies intercept and transmit these communications together with users' IP addresses, persistent Nielsen identifiers, including those assigned by the IMRID cookie, and device identifiers. Network traffic analysis of the Fox Sports application has also revealed that its transmissions to Nielsen's collection endpoint at secure-gl.imrworldwide.com carry an encoded location payload, derived from the user's IP address, that, when decoded, identifies the user's latitude and longitude, city, state, ZIP code, time zone, Nielsen-assigned market (DMA) code, and local broadcast-station call sign, transmitted together with identifiers for the specific content the user is viewing.

66. **Tubi (connected TV).** Tubi is a free streaming service available on Smart TVs and other devices, reporting tens of millions of monthly active users. When consumers watch Tubi on a connected television, Nielsen's SDK integrations collect and transmit to Nielsen, for all content viewed, the content's title, genre, and duration, together with second-by-second playback position, and ad-exposure events. Tubi also intercepts and discloses the titles of any "recommended" video content. Nielsen's Tracking Technologies intercept and transmit these communications together with users' IP addresses, the Google Advertising ID unique identifier, and device identifiers.

67. In each example, the interception occurs in real time, for every such interaction, without any visibility to the user. And in each example, the data does not merely serve the website or app the consumer chose to use: Nielsen stores the intercepted communications, merges them into its consumer profiles through the Identity System, and uses them to enhance the commercial products described above.

**G. Defendants Intercepted and Collected Users' Communications Without Knowledge or Consent**

68. At no point in any of this do consumers consent to Defendants' conduct. Nielsen is a business-to-business company: it deals with publishers, advertisers, platforms, and manufacturers, never with the consumers it tracks. Users are never presented with Nielsen's terms of use or privacy statements,

never agree to Nielsen's data collection, and have no opportunity to accept or refuse Nielsen's collection before it begins. Nielsen's data collection starts the instant a webpage loads, an app opens, or a television is turned on, before any privacy policy could be located, let alone read.

69. The privacy policies of the websites and apps on which Nielsen's Tracking Technologies are deployed do not supply consent. Those policies are typically presented, if at all, as "browsewrap": a hyperlink in small print at the bottom of a page, buried among other links, that users are never required to view or accept. Such notices are not conspicuous, do not require any manifestation of assent, and do not bind users. And even where a website's policy generically discloses sharing data with "partners" or "analytics providers," such generic disclosure does not identify Nielsen, does not describe the interception of communications in transit, does not disclose Nielsen's combination of those communications into cross-device consumer profiles, and does not disclose Nielsen's use of those profiles for its own commercial purposes. Consent, where it exists at all, is limited to the specific conduct authorized, and no user authorized the conduct alleged herein.

70. The same is true in the living room. Consumers purchasing Smart TVs are never told that Nielsen or Gracenote will receive a record of what their televisions display. The ACR settings buried in televisions' menus carry generic names that obscure both the nature of the surveillance and the identity of its beneficiaries, and upon information and belief ACR functions have commonly been enabled by default or activated through setup flows engineered to elicit a single global "agree." A consumer cannot consent to a data flow whose recipient is not named and whose scope, i.e., pixel-level capture of everything displayed from every input, is not described.

71. Defendants' own documents confirm the absence of consent. Nielsen's privacy statements are posted on Nielsen websites that tracked consumers never visit, and they describe data collection that has already occurred. A privacy disclosure that the affected person never sees provides neither notice nor consent.

72. Nor did any court authorize Defendants' conduct. Defendants have never obtained, or sought, a court order authorizing the installation or use of the tracking processes described herein, as California law requires for the use of any pen register or trap-and-trace device.

73. Plaintiffs and Class Members did not provide, and could not have provided, consent. They cannot consent to surveillance they do not know is occurring, conducted by companies they have never heard of, for purposes they were never told.

**H. Nielsen Is a Registered California Data Broker**

74. Nielsen's registration as a data broker in California was approved by the California Attorney General in 2020 and again in 2022 under the name "Nielsen Marketing Cloud," and maintained today through the registrations of The Nielsen Company, LLC and eXelate, Inc. (each doing business as "Nielsen Marketing Cloud") in the California Privacy Protection Agency's 2026 Data Broker Registry. This registration is itself an admission of the conduct at the heart of this case. California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship." Cal. Civ. Code § 1798.99.80(c). By registering, Nielsen has acknowledged that it collects and sells the personal information of California consumers who have no relationship with it. This action is brought on behalf of these consumers.

**FACTS SPECIFIC TO PLAINTIFFS**

75. During the Class Period, and as recently as June 2026, Plaintiff Amanda Fryslie, while located in California, used the Tubi streaming application on an internet-connected Onn Smart TV to watch television programming. Tubi deploys Nielsen's measurement software. Ms. Fryslie additionally used her Onn Smart TV to view other media, including but not limited to streaming media through other third-party applications.

76. When Ms. Fryslie watched programming through the Tubi application, Nielsen's embedded measurement software intercepted and transmitted to Nielsen-controlled servers, in real time and while her communications with the services were in transit, the contents of those communications, including the title of the videos she selected and watched, together with her unique identifiers, device identifiers and IP address. Ms. Fryslie thereafter received advertisements targeted to her based on her Tubi viewing activity. Additionally, upon information and belief, Defendants' ACR technology active on Plaintiff's Smart TV contemporaneously captured fingerprints of the content displayed on her television, and ACR-derived viewing data from her television was collected by, transmitted to, licensed to, or

otherwise obtained by Defendants in real-time and incorporated into Defendants' consumer profiles as described herein. After watching content on her Smart TV, including content on streaming applications other than Tubi, Ms. Fryslie also received advertisements relating to the content she watched on her television.

77. During the Class Period, and within the past year, Plaintiff Armando Llacuna, while located in California, also used the Tubi streaming application on his TCL internet-connected Smart TV to watch television content. Mr. Llacuna additionally used his Smart TV to view other media, including but not limited to: watching live television, streaming media through other applications in addition to Tubi, playing video games through an HDMI-connected video game console, and streaming videos through an HDMI-connected device. When Mr. Llacuna used the Tubi application, Nielsen's embedded measurement software likewise intercepted and transmitted to Nielsen, in real time, the contents of his communications, including the title of his video selections, together with his unique identifiers, device identifiers, and IP address. Additionally, upon information and belief, Defendants' ACR technology active on Plaintiff's Smart TV contemporaneously captured fingerprints of the content displayed on his television, and ACR-derived viewing data from his television was collected by, transmitted to, licensed to, or otherwise obtained by Defendants in real-time and incorporated into Defendants' consumer profiles as described herein. After watching content on his Smart TV, including live television, streaming apps, and video games, Mr. Llacuna received advertisements relating to the content he watched on his television.

78. During the Class Period, and within the past year, Plaintiff Badrul Ula, while located in California, used the ESPN website to read various articles and watch video content. Mr. Ula additionally owns and uses an LG Smart TV to view media, including but not limited to: watching live television, streaming media through applications downloaded on his Smart TV, and playing video games through an HDMI-connected video game console. When Mr. Ula used the ESPN website, Nielsen's embedded measurement software intercepted and transmitted to Nielsen, in real time, the contents of his communications with ESPN, including the full page title and URL of every page and article viewed, the titles of each video viewed, content identifiers, and interaction data, together with his unique identifiers, device identifiers, and IP address. Additionally, upon information and belief, Defendants' ACR

technology active on Plaintiff's Smart TV contemporaneously captured fingerprints of the content displayed on his television, and ACR-derived viewing data from his television was collected by, transmitted to, licensed to, or otherwise obtained by Defendants in real-time and incorporated into Defendants' consumer profiles as described herein. Upon information and belief, after using the ESPN website and after watching content on his Smart TV, Mr. Ula received advertisements related to his use of ESPN and content he watched on his television.

79. Plaintiffs, respectively, have never had accounts with Tubi or ESPN. Neither have Plaintiffs purchased anything from, or subscribed to any newsletter of Tubi or ESPN; and they did not use an ad blocker, a virtual private network, or private-browsing tools in connection with their use of Tubi or ESPN. Plaintiffs never ever saw, were presented with, or agreed to any privacy policy or terms of use of Nielsen, Gracenote, Tubi, or ESPN, and they did not know that Nielsen or Gracenote existed in connection with these services, much less that Defendants were intercepting, collecting, and monetizing their communications. As such, Plaintiffs never consented to any of Defendants' conduct alleged herein. Plaintiffs have no relationship with either Defendant.

80. Upon information and belief, Defendants assigned Plaintiffs unique, persistent identifiers; combined Plaintiffs' intercepted communications and private viewing history with those identifiers and with data acquired from third parties; and created and maintain consumer profiles reflecting Plaintiffs' viewing activity, application usage, interests, characteristics, and locations. Defendants have used and continue to use these profiles for their own commercial purposes, including the audience measurement, segmentation, targeting, and advertising products described herein. The targeted advertisements Plaintiffs received on basis of their activity on Tubi, ESPN, and their Smart TVs are themselves evidence of that profiling.

81. Moreover, Plaintiffs continue to be interested in their ongoing use of Smart TVs and future use of the various websites and applications that the Tracking Technologies are implemented into, including, *inter alia*, the Tubi streaming applications and the ESPN website. Absent injunctive relief as set forth herein, Plaintiffs cannot continue to use these websites and applications and Smart TVs implementing Nielsen's ACR technology without their rights being violated. Indeed, because of the

surreptitious nature of Nielsen's tracking, Plaintiffs would likely be unaware that the Tracking Technologies and ACR technology were even implemented in the first place.

## CLASS ACTION ALLEGATIONS

82. **Class Definition:** Plaintiffs bring this action pursuant to California Code of Civil Procedure § 382 on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All California residents who, during the Class Period: (a) visited a website or used an application on which Nielsen's Tracking Technologies were deployed, including but not limited to ESPN.com, the ESPN mobile application, FoxBusiness.com, FoxSports.com, the Fox Sports mobile application, and Tubi; or (b) viewed content on an internet-connected Smart TV as to which ACR-derived viewing data was collected by, transmitted to, licensed to, or otherwise obtained by Defendants; or (c) otherwise had their communications or personal information collected by Defendants through the tracking and content-recognition technologies described herein, during the applicable limitations period before and after the filing of this Complaint and through and including the date of resolution (the "Class," and such period the "Class Period").
>
> Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

83. **Numerosity:** The exact number of Class Members is unknown to Plaintiffs at this time, but it is clear that individual joinder is impracticable. Nielsen's Tracking Technologies are deployed across thousands of websites and applications used by millions of Californians, and ACR-equipped Smart TVs sit in millions of California homes. Class Members can be identified through Defendants' own records, including the identifiers, profiles, and geolocation data Defendants maintain.

84. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions include, but are not limited to:

(a) Whether Defendants' Tracking Technologies and ACR software intercepted, read, attempted to read, or learned the contents of Class Members' communications while in transit;

(b) Whether Defendants' technologies constitute a "pen register" or records routing, addressing, or signaling information;

(c) Whether Defendants used the information so obtained for their own commercial purposes, including by combining it with unique identifiers into consumer profiles;

(d) Whether Defendants' conduct was willful and intentional;

(e) Whether Class Members consented;

(f) Whether Defendants accessed Class Members' devices without permission;

(g) Whether Defendants' conduct constitutes an egregious breach of social norms; and

(h) The proper measure of statutory damages, restitution, and other relief.

85. **Typicality:** Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs, like all Class Members, had their communications intercepted, collected, and monetized by Defendants through the same uniform technologies and the same centralized course of conduct.

86. **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions, including consumer privacy class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the resources to do so.

87. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable; individual litigation of millions of modest statutory-damages claims would be inefficient and would risk inconsistent adjudications; and a class action presents far fewer management difficulties while providing the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Defendants' uniform, centralized conduct makes classwide resolution appropriate.

88. Plaintiffs reserve the right to revise the foregoing class allegations and definitions, including by adding or modifying subclasses, based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the Class)**

89. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

90. CIPA § 631(a) imposes liability on any person who, "by means of any machine, instrument, or contrivance, or in any other manner": (1) "intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, line, cable, or instrument"; or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state"; or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"; or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above."

91. Defendants' Tracking Technologies and ACR software, including Nielsen's tags, pixels, cookies, and SDKs, and Gracenote's ACR systems, are each a "machine, instrument, or contrivance" within the meaning of § 631(a), and in any event effect the prohibited conduct "in any other manner."

92. When Plaintiffs and Class Members exchange communications with websites, mobile applications, and connected-TV services by requesting pages, entering search terms, selecting and viewing articles and videos, and interacting with content, those communications contain "contents" within the meaning of CIPA, including URLs identifying the specific pages and materials requested, search terms, content selections, and viewing activity that reveal the substance and meaning of what Plaintiffs and Class Members were reading, watching, and doing.

93. Defendants, through the Tracking Technologies embedded on websites and applications, willfully read, attempted to read, and learned the contents and meaning of Plaintiffs' and Class Members'

communications while those communications were in transit, contemporaneously with their occurrence, by causing Plaintiffs' and Class Members' browsers and devices to duplicate and transmit those communications to Nielsen's servers, including servers operating on the imrworldwide.com domain, at the same moment they traveled between Plaintiffs and Class Members and the services they chose to use. Plaintiffs' and Class Members' communications were sent from and received at places within California.

94. Defendants likewise read, attempted to read, and learned the contents of communications displayed on Plaintiffs' and Class Members' televisions through ACR technology, which captures and fingerprints the content shown on screen on a second-by-second or near-continuous basis and transmits it, with device identifiers, for identification and logging.

95. Defendants then used, and continue to use, the information so obtained, in violation of § 631(a)'s third prong, by processing the intercepted communications, combining them with unique persistent identifiers through the Nielsen Identity System, constructing consumer profiles, enriching those profiles with third-party data, and selling measurement, segmentation, and targeting products built from them. This use was for Defendants' own independent commercial purposes, not merely on behalf of the websites and services with which Plaintiffs and Class Members chose to communicate.

96. Each Defendant also aided, agreed with, employed, and conspired with the other, and with the publishers, developers, manufacturers, and platform partners that deployed Defendants' technologies, to do the acts alleged herein, in violation of § 631(a)'s fourth prong. Nielsen directs and profits from Gracenote's ACR collection; Gracenote supplies the ACR data that feeds Nielsen's products; and Defendants jointly maintain the identity infrastructure that fuses the intercepted data into consumer profiles.

97. Plaintiffs and Class Members did not consent to any of this conduct, and Defendants' interception, reading, and use of their communications was not authorized by any party to those communications or by any court.

98. Defendants' conduct was intentional and willful. Defendants designed, marketed, deployed, and profited from the very technologies that effected the interceptions.

99. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation, injunctive relief enjoining Defendants' ongoing violations, and all other available relief. Plaintiffs need not allege or prove actual damages to recover under § 637.2.

**SECOND CAUSE OF ACTION**
**Violation of Cal. Penal Code § 638.51**
**(On Behalf of Plaintiffs and the Class)**

100. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

101. Cal. Penal Code § 638.51(a) prohibits any person from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

102. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

103. Defendants' Tracking Technologies are "devices or processes" that record and decode routing, addressing, and signaling information transmitted from Plaintiffs' and Class Members' devices, including: IP addresses, which route and address Plaintiffs' and Class Members' communications and identify their general locations; device identifiers, including mobile advertising identifiers and Smart TV device identifiers; persistent cookie identifiers, including the IMRID cookie; referrer information; and timestamps. Defendants' software identifies consumers, gathers data, and correlates that data across websites, applications, devices, and televisions, precisely the kind of process that records addressing and signaling information from electronic communications.

104. Defendants installed and used these devices and processes on and against Plaintiffs' and Class Members' browsers, devices, and televisions, and continue to do so.

105. Defendants did not first obtain a court order authorizing the installation or use of any pen register or trap and trace device, and no statutory exception under Cal. Penal Code § 638.51(b) applies. Plaintiffs and Class Members did not consent to the installation or use of these devices and processes.

106. To the extent Defendants' technologies simultaneously captured both contents (supporting Plaintiffs' claim under § 631) and routing, addressing, and signaling information (supporting this claim under § 638.51), the distinct collection functions constitute distinct devices or processes, and both claims lie. Defendants' decision to collect more data, not less, does not immunize either category of collection.

107. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation, injunctive relief, and all other available relief.

**THIRD CAUSE OF ACTION**
**Unlawful Recording of and Eavesdropping Upon Confidential Communications,**
**Violation of Cal. Penal Code § 632**
**(<u>On Behalf of Plaintiffs and the Class</u>)**

108. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

109. Cal. Penal Code § 632(a) imposes liability on any person who, "intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

110. Defendants' Tracking Technologies and ACR software are electronic recording devices within the meaning of § 632. They duplicate and record Plaintiffs' and Class Members' communications in real time, including the pages they request, the search terms they enter, the articles and videos they select and view, and the content displayed on their home television screens, together with IP addresses, device identifiers, and other identifying information.

111. Section 632(c) defines a "confidential communication" to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

112. Plaintiffs' and Class Members' communications were confidential within the meaning of § 632. A person reading financial news, researching investments, browsing content reflecting personal interests, or watching programs, films, and games in the privacy of the home reasonably expects those

communications to be confined to the parties to them: the user and the website or service the user chose, or the members of the household in the living room. Nothing about visiting a website or turning on a television reasonably indicates that an undisclosed measurement conglomerate is recording the exchange. The expectation of confidentiality is at its strongest for in-home television viewing: what a family displays on its own screen, including content from DVDs, game consoles, and personal devices that is never transmitted to any online service, is communicated to no one outside the home at all.

113. Defendants intentionally recorded and eavesdropped upon these confidential communications using the technologies described herein, without the consent of Plaintiffs, Class Members, or, as to the in-home displays, any party whatsoever.

114. Plaintiffs' and Class Members' expectation that their communications were not being recorded by Defendants was objectively reasonable, arising from, among other things: (a) the objective offensiveness of surreptitiously recording private browsing and in-home viewing; (b) the ease with which Defendants could have provided disclosure and sought consent, and their failure to do so; and (c) the absence of any relationship between Plaintiffs and Class Members and Defendants that would have put Plaintiffs and Class Members on notice of Defendants' involvement.

115. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation, injunctive relief, and all other available relief.

**FOURTH CAUSE OF ACTION**
**Violation of the California Comprehensive Computer Data Access and Fraud Act,**
**Cal. Penal Code § 502**
**(<u>On Behalf of Plaintiffs and the Class</u>)**

116. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

117. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, to "expand the degree of protection afforded to individuals ... from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," finding that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." Cal. Penal Code § 502(a).

118. Plaintiffs' and Class Members' computers, smartphones, tablets, and Smart TVs are "computers," "computer systems," and/or "computer networks" within the meaning of § 502(b).

119. Defendants violated, at minimum, the following provisions of § 502(c):

(a) § 502(c)(1), by knowingly accessing and without permission using Plaintiffs' and Class Members' computers, computer systems, and data in order to wrongfully obtain data and property, namely, Plaintiffs' and Class Members' communications and personal information, which Defendants converted into commercial products;

(b) § 502(c)(2), by knowingly accessing and without permission taking, copying, and making use of data from Plaintiffs' and Class Members' computers, computer systems, and computer networks; and

(c) § 502(c)(7), by knowingly and without permission accessing and causing to be accessed Plaintiffs' and Class Members' computers, computer systems, and computer networks.

120. Defendants acted knowingly and without permission. Defendants designed their technologies to execute automatically on Plaintiffs' and Class Members' devices, to write and read persistent identifiers on those devices, to cause those devices to transmit data to Defendants' servers, and to do all of this invisibly, without notice to or authorization from the devices' owners.

121. Plaintiffs and Class Members suffered damage and loss by reason of Defendants' violations, including: (a) the unauthorized occupation of storage and consumption of computing, battery, and network resources on their devices; (b) the unauthorized extraction and output of their data; (c) the diminution in value of their personal information, which Defendants took and monetized without compensation; and (d) the violation of their rights to control their devices and data. Defendants were unjustly enriched by the same conduct.

122. Pursuant to Cal. Penal Code § 502(e), Plaintiffs and the Class seek compensatory damages, injunctive and other equitable relief, attorneys' fees, and, because Defendants' violations were willful and Defendants are guilty of oppression, fraud, or malice, punitive or exemplary damages.

**FIFTH CAUSE OF ACTION**

**Invasion of Privacy in Violation of Article I, Section 1 of the California Constitution**
**(On Behalf of Plaintiffs and the Class)**

123. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

124. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." The right of privacy is self-executing and creates a right of action against private entities.

125. Plaintiffs and Class Members have legally protected privacy interests in their communications with the websites and services they choose to use; in their browsing, search, and application activity; in what they watch, play, and display on the televisions in their homes; in their IP addresses, locations, and device identifiers; and in the aggregation of all of the foregoing into unified profiles of their lives. These interests are recognized by the California Constitution, by CIPA, by the CDAFA, and by California's data broker and consumer privacy statutes.

126. Plaintiffs and Class Members had a reasonable expectation of privacy in these matters. They had no relationship with Defendants, no notice of Defendants' surveillance, and no reason to expect that an invisible third party was recording their browsing and their living-room screens and assembling the results into commercial dossiers.

127. Defendants' conduct constitutes an egregious breach of social norms: a serious invasion of privacy in its nature, scope, and impact. Defendants surreptitiously intercepted the communications of millions of Californians across thousands of websites and applications and tens of millions of televisions; combined those communications with unique identifiers, credit-bureau data, and data-broker files into persistent cross-device profiles; extended that surveillance into the home itself, capturing second-by-second what families display on their own screens, including video games, DVDs, and personal media never shared with any online service; and sold the results for profit. Reasonable people do not expect, and social norms do not tolerate, hidden corporate surveillance of the family television.

128. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered injury, including the invasion of their constitutionally protected privacy interests, the loss of control over their personal information, and the loss of the economic value of that information.

129. Plaintiffs and the Class seek all available relief, including nominal and compensatory damages, restitution and disgorgement of the profits Defendants earned from their unlawful surveillance, and injunctive relief halting Defendants' ongoing violations.

**SIXTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On Behalf of Plaintiffs and the Class)**

130. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

131. California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Defendants' acts and practices alleged herein are "business practices" within the meaning of the UCL.

132. Defendants violated the UCL's "unlawful" prong by violating Cal. Penal Code §§ 631, 638.51, 632, and 502; Article I, Section 1 of the California Constitution; and the common law, as alleged herein.

133. Defendants' conduct also violates the UCL's "unfair" prong. The harm from Defendants' secret interception, profiling, and monetization of consumers' communications vastly outweighs any utility of conducting audience measurement without consent. The conduct offends established public policy as embodied in California's constitutional privacy guarantee and privacy statutes, and it is immoral, unethical, oppressive, and unscrupulous. Reasonably available alternatives, including measurement based on disclosed, consented panels, the very model on which Nielsen built its name, further Defendants' legitimate business interests without secret mass surveillance.

134. As a result of Defendants' violations, Plaintiffs and Class Members suffered injury in fact and lost money or property: their personal information, which has ascertainable economic value and which Defendants themselves monetize, was taken from them without compensation, and they were deprived of the value and control of their data. Plaintiffs and Class Members would not have used the affected

websites, applications, and televisions as they did, or would have demanded compensation or taken protective measures, had they known of Defendants' conduct.

135. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class seek restitution of all money and property Defendants acquired by means of their unlawful and unfair practices, and an injunction prohibiting Defendants from continuing those practices, including an order requiring Defendants to cease intercepting Class Members' communications, to delete all data and profiles derived from the conduct alleged herein, and to cease selling products built from that data. Plaintiffs lack an adequate remedy at law for the ongoing and threatened future conduct alleged herein.

**SEVENTH CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(<u>On Behalf of Plaintiffs and the Class</u>)**

136. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

137. Defendants intentionally intruded upon Plaintiffs' and Class Members' solitude, seclusion, and private affairs by surreptitiously intercepting, recording, collecting, and aggregating their communications, browsing activity, application usage, in-home television viewing, IP addresses, locations, and device identifiers, and by constructing and maintaining profiles of their lives from that data.

138. Plaintiffs and Class Members had a reasonable expectation of privacy in these matters. The intrusion reached into the home itself, the place where privacy expectations are strongest, capturing what families watched, played, and displayed on their own screens, without notice, from companies with which they had no relationship.

139. Defendants' intrusion is highly offensive to a reasonable person because it: (a) was hidden by design; (b) was conducted at staggering scale; (c) captured intimate, expressive activity (reading, viewing, and play) second by second; (d) fused that activity with credit-bureau and data-broker files into persistent dossiers; (e) defeated consumers' attempts to protect themselves; and (f) was carried out for commercial gain, without consent or compensation.

140. As a direct and proximate result of Defendants' intrusion, Plaintiffs and Class Members suffered harm, including the violation of their privacy interests, the loss of control over their personal

information, and emotional distress from learning that their private activities, including in their homes, were secretly monitored, recorded, and sold.

141. Defendants acted with malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights, entitling Plaintiffs and the Class to punitive damages in an amount sufficient to punish Defendants and deter similar conduct.

142. Plaintiffs and the Class seek compensatory and punitive damages, disgorgement of the profits Defendants earned from their intrusion, and all other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

(a) An order certifying the Class as defined above, appointing Plaintiffs Amanda Fryslie, Armando Llacuna, and Badrul Ula as representatives of the Class, and appointing their counsel as Class Counsel;

(b) An order declaring that Defendants' conduct, as set out above, violates Cal. Penal Code §§ 631, 638.51, 632, and 502; Article I, Section 1 of the California Constitution; Cal. Bus. & Prof. Code § 17200, et seq.; and the common law prohibition on intrusion upon seclusion;

(c) Statutory damages of $5,000 per violation pursuant to Cal. Penal Code § 637.2;

(d) Compensatory, nominal, and punitive damages in amounts to be determined at trial;

(e) Restitution and disgorgement of all ill-gotten gains acquired by means of Defendants' unlawful and unfair practices;

(f) Preliminary and permanent injunctive relief requiring Defendants to cease the unlawful conduct alleged herein, including to cease intercepting Class Members' communications, to delete all data and profiles derived from that conduct, and to cease the sale and commercial use of such data;

(g) An award of reasonable attorneys' fees and costs, including pursuant to Cal. Penal Code § 502(e)(2), Cal. Code Civ. Proc. § 1021.5, and any other applicable law; and

(h) Pre- and post-judgment interest, and such other and further relief as the Court deems reasonable and just.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims and causes of action so triable.

Dated: July 10, 2026

Respectfully submitted,

By: */s/ Matthew W. Ruan*

Matthew W. Ruan (SBN 264409)
Jonathan M. Jagher*
Nicholas R. Lange*
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com
jjagher@jjlmlaw.com
nlange@jjlmlaw.com

John A. Carriel*
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 503-0578
john.carriel@ksfcounsel.com

*Counsel for Plaintiffs and the Proposed Class*

*Pro hac vice application forthcoming

# EXHIBIT 2

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
MATTHEW W. RUAN, ESQ. (SBN 264409)

JUSTICE JAGHER LONDON & MILLEN LLC
100 TRI-STATE INTERNATIONAL, STE 128
LINCOLNSHIRE, IL 60069

TELEPHONE NO.: 224-632-4500 FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): PLAINTIFFS AMANDA FRYSLIE, ARMANDO LLACUNA, AND BADRUL ULA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1221 OAK STREET
MAILING ADDRESS: 1221 OAK STREET
CITY AND ZIP CODE OAKLAND, CA 94612
BRANCH NAME: OAKLAND - ADMINISTRATION BUILDING

FOR COURT USE ONLY

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**07/29/2026 at 08:20:31 AM**
By: Maria Alvarado,
Deputy Clerk

PLAINTIFF/PETITIONER: AMANDA FRYSLIE, ET AL.

DEFENDANT/RESPONDENT: THE NIELSEN COMPANY (US), LLC AND GRACENOTE, INC.

CASE NUMBER:
26CV198309

**PROOF OF SERVICE OF SUMMONS**

ref No. or File No.

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   - a. ☑ summons
   - b. ☑ complaint
   - c. ☐ Alternative Dispute Resolution (ADR)) package
   - d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   - e. ☐ cross-complaint
   - f. ☑ other *(specify documents)*: CIVIL COVER SHEET ADDENDUM; NOTICE
3. a. Party served *(specify name of party as shown on documents served)*:
   THE NIELSEN COMPANY (US), LLC

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   COGENCY GLOBAL INC., AS AGENT, ACCEPTED BY TERESA GRANDISON (MANAGING AGENT EMPLOYED AT REGISTERED AGENT)
4. Address where the party *was* served:
   850 NEW BURTON ROAD, SUITE 201, DOVER, DE 19904
5. I served the party (check proper box)

   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: 07/17/2026 (2) at *(time)*: 3:55 PM

   b. ☐ **by substituted service.** On *(date)*: at *(time)*.- I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served, I informed him or her of the general nature of the papers.

   (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on (date): from (city): or ☐ a declaration of mailing is attached.

   (5) ☐ I attach a declaration, **of diligence** stating actions taken first to attempt personal service.

| PLAINTIFF/PETITIONER: AMANDA FRYSLIE, ET AL. | CASE NUMBER |
| --- | --- |
| DEFENDANT/RESPONDENT: THE NIELSEN COMPANY (US), LLC AND GRACENOTE, INC. | 26CV198309 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on (date): (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ by other means *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* THE NIELSEN COMPANY (US), LLC
   under the following Code of Civil Procedure section:

| | |
| --- | --- |
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 Joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☑ other: LLC |

7. Person who served papers
   a. Name: FRANK PRITCHETT
   b. Address: PO BOX 1360, WILMINGTON, DE 19899
   c. Telephone number: 302-475-2600
   d. The fee for service was: $
   e. I am:
   (1) ☑ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☐ a registered California process server:
   (i) ☐ owner ☐ employee ☐ independent contractor.
   (ii) Registration No.:
   (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 07/29/2026

FRANK PRITCHETT
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ [signature]
(SIGNATURE)

# EXHIBIT 3

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
MATTHEW W. RUAN, ESQ. (SBN 264409)

JUSTICE JAGHER LONDON & MILLEN LLC
100 TRI-STATE INTERNATIONAL, STE 128
LINCOLNSHIRE, IL 60069

TELEPHONE NO.: 224-632-4500 FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): PLAINTIFFS AMANDA FRYSLIE, ARMANDO LLACUNA, AND BADRUL ULA

FOR COURT USE ONLY

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**07/29/2026 at 08:19:27 AM**
By: Maria Alvarado,
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1221 OAK STREET
MAILING ADDRESS: 1221 OAK STREET
CITY AND ZIP CODE OAKLAND, CA 94612
BRANCH NAME: OAKLAND - ADMINISTRATION BUILDING

PLAINTIFF/PETITIONER: AMANDA FRYSLIE, ET AL.

DEFENDANT/RESPONDENT: THE NIELSEN COMPANY (US), LLC AND GRACENOTE, INC.

CASE NUMBER:
26CV198309

## PROOF OF SERVICE OF SUMMONS

ref No. or File No.

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. 1 served copies of:
   a. ☑ summons
   b. ☑ complaint
   c. ☐ Alternative Dispute Resolution (ADR)) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-com plaint
   f. ☑ other *(specify documents):* CIVIL COVER SHEET ADDENDUM; NOTICE
3. a. Party served *(specify name of party as shown on documents served):*
   GRACENOTE, INC.
   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   COGENCY GLOBAL INC., AS AGENT, ACCEPTED BY TERESA GRANDISON (MANAGING AGENT EMPLOYED AT REGISTERED AGENT)
4. Address where the party *was* served:
   850 NEW BURTON ROAD, SUITE 201, DOVER, DE 19904
5. I served the party (check proper box)
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 07/17/2026 (2) at *(time):* 3:55 PM
   b. ☐ **by substituted service.** On *(date):* at *(time).-* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*
      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served, I informed him or her of the general nature of the papers.
      (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). 1 mailed the documents on (date): from (city): or ☐ a declaration of mailing is attached.
      (5) ☐ I attach a declaration, **of diligence** stating actions taken first to attempt personal service.

| PLAINTIFF/PETITIONER: AMANDA FRYSLIE, ET AL. | CASE NUMBER |
|---|---|
| DEFENDANT/RESPONDENT: THE NIELSEN COMPANY (US), LLC AND GRACENOTE, INC. | 26CV198309 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on (date): (2) from *(city)*:

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ by other means *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* GRACENOTE, INC.
   under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 Joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. Person who served papers
   a. Name: FRANK PRITCHETT
   b. Address: PO BOX 1360, WILMINGTON, DE 19899
   c. Telephone number: 302-475-2600
   d. The fee for service was: $
   e. I am:
   (1) ☑ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☐ a registered California process server:
   (i) ☐ owner ☐ employee ☐ independent contractor.
   (ii) Registration No.:
   (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foreqoinq is true and correct.

or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 07/29/2026

FRANK PRITCHETT
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

(SIGNATURE)

# EXHIBIT 4

850

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ELECTRONICALLY FILED
Superior Court of California
County of Alameda
07/10/2026
Chad Finke, Executive Officer / Clerk of the Court
By: A. Gospel Deputy

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
The Nielsen Company (US), LLC and Gracenote, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Amanda Fryslie, Armando Llacuna, and Badrul Ula, individually and on behalf of all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡**AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Oakland - Administration Building
1221 Oak Street Oakland, CA 94612

CASE NUMBER:
*(Número del Caso):*
26CV198309

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Matthew W. Ruan, 100 Tri-State International, Suite 128 Lincolnshire, IL 60069 (224) 632-4500

DATE: 07/10/2026 Clerk, by *(Secretario)* [signature] A. Gospel , Deputy *(Adjunto)*
*(Fecha)* Chad Finke, Executive Officer / Clerk of the Court

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Gracenote, Inc.
   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☒ by personal delivery on *(date)*: 7/16/2026

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY | FOR COURT USE ONLY |
|---|---|
| STATE BAR NUMBER: 264409<br>NAME: Matthew W. Ruan<br>FIRM NAME: Justice Jagher London & Millen LLC<br>STREET ADDRESS: 100 Tri-State International, Suite 128<br>CITY: Lincolnshire STATE: IL ZIP CODE: 60056<br>TELEPHONE NO.: (224) 632-4500 FAX NO.:<br>EMAIL ADDRESS: mruan@jjlmlaw.com<br>ATTORNEY FOR (*name*): Plaintiffs Amanda Fryslie, Armando Llacuna, and Badrul Ula | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>**07/10/2026 at 02:42:35 PM**<br>By: Andrel Gospel,<br>Deputy Clerk |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**<br>STREET ADDRESS: 1221 Oak Street<br>MAILING ADDRESS: 1221 Oak Street Oakland, CA 94612<br>CITY AND ZIP CODE: Oakland, CA 94612<br>BRANCH NAME: Oakland - Administration Building | |
| CASE NAME:<br>Fryslie, et al., v. The Nielsen Company (US), LLC and Gracenote, Inc. | |

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: 26CV198309 |
|---|---|---|
| [X] **Unlimited** (Amount demanded exceeds $35,000) [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2 and examples on page 3).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Asbestos**
- [ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/Unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [X] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Song-Beverly Act: Motor Vehicle Lemon Law (49)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Employment Development Department (EDD)**
- [ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Comprehensive groundwater adjudication (47)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. Is this case complex under rule 3.400 of the California Rules of Court? [x] Yes [ ] No

If the case is complex, mark the factors requiring exceptional judicial management:

a. [ ] Large number of separately represented parties
b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [x] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [x] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*:

a. [x] monetary
b. [x] nonmonetary; declaratory or injunctive relief
c. [x] punitive

4. Number of causes of action *(specify)*: 7 - Violation of Cal. Penal Code § 631; Violation of Cal. Penal Code § 638.51

5. Is this case a class action suit? [x] Yes [ ] No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 10, 2026

Matthew W. Ruan ▶ *Matthew W. Ruan*

Type or print name — Signature of party or attorney for party

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, or a collections case under rule 3.740, you must serve a copy of this cover sheet on all other parties to the action or proceeding. (Cal. Rules of Court, rule 3.220.)
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided on page 3 of this form. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

## CASE TYPES AND EXAMPLES

The list below provides explanations and examples for the case type checkboxes listed in item 1 on this form. The lists of examples below are not meant to be exhaustive, and some case types may have causes of action not listed here.

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/ Wrongful Death
- Uninsured Motorist *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)* (46)

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or environmental/toxic tort)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud *(other than contract)* (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Song-Beverly Act: Motor Vehicle Lemon Law *(check this item if the case involves a Song-Beverly Act claim regarding a motor vehicle)* (49)
- Rule 3.740 Collections *(as defined in Cal. Rules of Court, rule 3.740(a))* (09)
- Other Collections (e.g., money owed, open book accounts, promissory note) (09)
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not unlawful detainer)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs *(if the case involves illegal drugs, check this item; otherwise, choose Commercial or Residential)* (38)

**Judicial Review**
- Asset Forfeiture (05)
- Petition re Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review *(if the case involves an Employment Development Department decision, check this item instead of wrongful termination or other employment)* (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/ non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Government Claim Requirement
  - Other Civil Petition

Unified Rules of the Superior Court of California, County of Alameda

F. ADDENDUM TO CIVIL CASE COVER SHEET

**Short Title:** Fryslie, et al., v. The Nielsen Company (US), LLC and Gracenote, Inc.

**Case Number:** 26CV198309

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
07/10/2026 at 02:42:35 PM
By: Andrea Gospel,
Deputy Clerk

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ ] Oakland, Rene C. Davidson Alameda County Courthouse (446)
[✓] Hayward Hall of Justice (4[illegible])
[ ] Pleasanton, Gale-Schenone Hall of Justice (4[illegible])

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G) |
| | | **Is this an uninsured motorist case? [ ] yes [ ] no** |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] 75 Asbestos (D) |
| | Product liability (24) | [ ] 89 Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] 97 Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] 79 Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] 80 Civil rights (G) |
| | Defamation (13) | [ ] 84 Defamation (G) |
| | Fraud (16) | [ ] 24 Fraud (G) |
| | Intellectual property (19) | [ ] 87 Intellectual property (G) |
| | Professional negligence (25) | [ ] 59 Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [✓] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] 38 Wrongful termination (G) |
| | Other employment (15) | [ ] 85 Other employment (G) |
| | | [ ] 53 Labor comm award confirmation |
| | | [ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] 04 Breach contract / Wrnty (G) |
| | Collections (09) | [ ] 81 Collections (G) |
| | Insurance coverage (18) | [ ] 86 Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] 18 Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] 17 Wrongful eviction (G) |
| | Other real property (26) | [ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] 94 Unlawful Detainer - commercial |
| | Residential (32) | [ ] 47 Unlawful Detainer - residential |
| | Drugs (38) | [ ] 21 Unlawful detainer - drugs |
| | | **Is the deft. in possession of the property? [ ] Yes [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] 41 Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] 62 Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] 49 Writ of mandate |
| | | **Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No** |
| | Other judicial review (39) | [ ] 64 Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] 77 Antitrust / Trade regulation |
| | Construction defect (10) | [ ] 82 Construction defect |
| | Claims involving mass tort (40) | [ ] 78 Claims involving mass tort |
| | Securities litigation (28) | [ ] 91 Securities litigation |
| | Toxic tort / Environmental (30) | [ ] 93 Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] 95 Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment |
| | | [ ] 08 Confession of judgment |
| Misc Complaint | RICO (27) | [ ] 90 RICO (G) |
| | Partnership / Corp. governance (21) | [ ] 88 Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name |
| | | [ ] 69 Other petition |

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp<br>**FILED**<br>Superior Court of California<br>County of Alameda<br>07/10/2026<br>Chad Finke, Executive Officer/Clerk of the Court<br>By: [signature] Deputy<br>A. Gospel |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | |
| PLAINTIFF:<br>Amanda Fryslie et al | |
| DEFENDANT:<br>The Nielsen Company (US), LLC, et al | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>26CV198309 |

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

| | | |
|---|---|---|
| Date: 11/30/2026 | Time: 2:30 PM | Dept.: 21 |
| Location: Rene C. Davidson Courthouse<br>Administration Building, 1221 Oak Street, Oakland, CA 94612 | | |

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Expedited Jury Trials

If the parties agree, they may try the case in an Expedited Jury Trial. Code of Civ. Proc. § 630.01 et seq. In short, the parties would agree to the following: 8 jurors (6 must agree); 3 peremptory challenges per side; 5-hour time limit per side, unless otherwise agreed and approved; one to two court days for completion, unless otherwise agreed and approved; high/low arrangement option; and limited right to appeal. For additional information, please see the following links:

- EJT-010-INFO* Expedited Jury Trial Information Sheet (ca.gov)
- EJT-008 Agreement of Parties (Mandatory Expedited Jury Trial Procedures) (ca.gov)
- EJT-020 [Proposed] Consent Order for Voluntary Expedited Jury Trial (ca.gov)

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp<br>FILED<br>Superior Court of California<br>County of Alameda<br>07/10/2026<br>Chad Finke, Executive Officer/Clerk of the Court<br>By: [signature] Deputy<br>A. Gospel |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | |
| PLAINTIFF/PETITIONER:<br>Amanda Fryslie et al | |
| DEFENDANT/RESPONDENT:<br>The Nielsen Company (US), LLC, et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>26CV198309 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Matthew W. Ruan
Justice Jagher London & Millen LLC
100 Tri-State International Suite 128
Lincolnshire, IL 60069

Chad Finke, Executive Officer / Clerk of the Court

Dated: 07/13/2026 By: [signature]

A. Gospel, Deputy Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August 2026, I caused the foregoing **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332, 1441(a), 1453, AND 1446** to be electronically filed with the Clerk of the Court using the CM/ECF and a copy of the foregoing to be served via email on the following counsel:

Matthew W. Ruan
Jonathan M. Jagher
Nicholas R. Lange
JUSTICE JAGHER LONDON & MILLEN LLC
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com
jjagher@jjlmlaw.com
nlange@jjlmlaw.com

*Attorneys for Plaintiffs*
*Amanda Fryslie, Armando Llacuna*
*and Badrul Ula*

John A. Carriel
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 503-0578
john.carriel@ksfcounsel.com

**TROUTMAN PEPPER LOCKE LLP**

By: */s/ Chloe Ann Lee*
Chloe Ann Lee

*Attorneys for Defendants,*
*The Nielsen Company (US), LLC and*
*Gracenote, Inc.*